Gregory K. HOPKINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 44388.

Court of Criminal Appeals of Texas.

March 22, 1972.

Rehearing Denied June 7, 1972.

M. N. Garcia, Austin, for appellant.

Robert O. Smith, Dist. Atty., Phoebe Lester, Asst. Dist. Atty., and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from a conviction for unlawful possession of heroin. Trial was before a jury, with punishment assessed by the court at confinement for five years.

The evidence reflects that Frank Marquez, a former heroin addict, contacted Sergeant Bobby Sides of the Austin Police Department in regard to making some undercover purchases of heroin for the police. As a result of the conversation, Marquez came to the Austin Police Station, where he was searched and given five dollars with which to make the purchase. Officer Sides and Marquez then left the police station in an automobile which had been specially prepared for undercover work. Marquez drove, and Officer Sides rode in the trunk, which had been outfitted with a radio for communication. In addition, several holes had been bored in the rear fenders of the car, and the taillight assembly had been removed so that the occupant of the trunk could see out. Sides and Marquez proceeded to a location on East Eleventh Street in the city of Austin, where the car stopped and Marquez got out and approached a group of people who were standing on the sidewalk and asked if he could buy some heroin. One member of the group, Bobby Guice, then signaled to appellant, who was located a short distance up the street in a car. The appellant then came to the location where Marquez and Guice were standing. Guice introduced Marquez to the appellant and told him that "He (appellant) is allright." Marquez then gave the five dollars to Guice, who gave it immediately to appellant. The appellant then handed the capsule of heroin to Marquez. Marquez returned to the car and drove away.

From his vantage point in the trunk, Officer Sides was unable to discern the the object which appellant gave to Marquez, but shortly thereafter, the car stopped and Officer Sides took the capsule from Marquez, who testified that it was the same one which he had received from appellant. Also, as Marquez returned to the car, he opened his hand, which held the capsule, so that Sides could see it from the trunk.

Appellant raises two grounds of error. In his first ground he contends that the trial court erred in not granting his motion for mistrial. He contends that certain testimony by Marquez was unduly prejudicial and that it improperly concerned his character and reputation. In particular, he

complains of the following portions of Marquez' testimony:

"A Yes, sir. And we talked about an undercover buy for some known dope pushers, you know, that I know.

"Q That you had already had knowledge of?

"A Yes, sir.

"MR. GARCIA: Your Honor, I want to object to any reference to any outside activities by this Defendant, because we are here concerned with this particular Defendant, and I object and except to any extraneous matter.

"THE COURT: The conversation at the Police Department is hearsay. I will sustain the objection.

"Q All right, Frank, as a result of your discussions with the Austin police officers, what, if anything, happened at that time?

"A Yes, sir, we had decided to—we decided to go and try to find some of the people I know who were pushing dope.

"Q All right, and what took place then, if anything?

"A Well, yes, sir, I was searched.

"MR. GARCIA: Your Honor, I object and except to the word used, pushing. I think it is highly prejudicial in this case, and I ask the Court to have it stricken from the record and instruct the jury not to consider it for any purpose.

"THE COURT: Objection will be overruled.

"MR. GARCIA: Note our exception.

*    *    *    *    *    *

"A Yes, sir. Well, I had seen him before, you know. I know that he run around with Bobby Lee Guice, and they sell dope, you know, so—

"MR. GARCIA: Your Honor, I am going to object. This is completely prejudicial as to what they did, not specifically referring to this Defendant, and has nothing to do with this case. It is prejudicial, and I ask the Court to instruct the jury not to consider it for any purpose.

"MR. IRELAND (Assistant District Attorney): Your Honor, we move that that be stricken from the record.

"MR. GARCIA: May we have an instruction from the Court, Your Honor, to the jury?

"THE COURT: Ladies and gentlemen, you will disregard the last question and answer, for any purpose whatsoever.

*    *    *    *    *    *

"Q You say anything to Gregory Kent Hopkins?

"A Yes, sir, I did. You see, at the time that I was there talking to them colored boys, one of them came over there and scored.

"Q Now, scored?

"A To buy some dope.

"MR. GARCIA: Your Honor, I am going to object. This is highly prejudicial. This is the same kind of question and answer I objected to a minute ago, and we ask the Court to instruct the District Attorney not to ask this type of question.

He knows it is prejudicial, and we ask the Court to—

"THE COURT: I will allow the conversation if the Defendant was present and overheard it. If you will establish that as a basis, it is admissible; if not, it is hearsay, and not admissible. Please lay the proper predicate.

*    *    *    *    *    *

"A Oh, you see, I approached Greg right there, you know, and I asked him, 'Say, have you got any dope?'

He said, 'No, man, I haven't got anything,' you know.

Well, he didn't know me, you know. I would have done the same thing if he would have approached me. I probably wouldn't have sold it because—

"MR. GARCIA: Your Honor, I object. This is rambling on the part of the witness. We don't care what he would have done, and to say what he would do under similar circumstances if somebody approached him for buying dope has nothing to do with this Defendant.

"THE COURT: Objection sustained.

"MR. GARCIA: May we have an instruction to the jury, Your Honor, to disregard that complete statement by the Defendant?

"THE COURT: Ladies and gentlemen, disregard the last question and answer.

* * * * * *

"A I started talking to another colored boy, and Gregory went off. He headed eastbound and—

"Q On Eleventh Street?

"A On Eleventh Street.

"Q All right.

"A About two or three minutes later, Bobby Lee came across the street from Eleventh.

"Q Bobby Lee? Now, who is Bobby Lee?

"A. Guice.

"Q All right.

"A And he knew me, you know. He had sold to me, so—

"MR. GARCIA: Your Honor, we are not interested in what somebody else has done in this case. We are interested in what has happened in this case, and it is all prejudicial to refer to any actions outside of this particular Defend-

ant, and I ask the Court to instruct the jury not to consider it for any purpose.

"THE COURT: Objection sustained.

"MR. GARCIA: May we have an instruction now?

"Q All right, Frank, just testify as to what you saw and what you did.

"THE COURT: Ladies and gentlemen, consider only the actions.

"MR. GARCIA: Your Honor, at this time, we ask for a mistrial on the grounds that no instruction to the jury can erase from the jury's mind any prejudicial evidence that has been heretofore testified to by this witness, and we ask for a mistrial.

"THE COURT: Request denied."

Appellant's first objection was sustained by the court. No request for an instruction to the jury to disregard the answer was made, nor was a mistrial requested at that time. Appellant's counsel then objected to the word *pushing*, but the objection was overruled. The next objection was sustained, and the jury was instructed to disregard the question and answer. No request for mistrial was made at that time. The next objection was sustained pending a prior predicate. The next objection was overruled on the ground that the witness was testifying as to what he had observed. The objection was not on the ground that it indicated an extraneous offense or that it concerned the appellant's character, which is the ground raised on appeal, but on the basis that the wit-. ness was not testifying from first-hand knowledge. The next objection was sustained, and appellant's request for an instruction to the jury to disregard the question and answer was granted. The next objection, which was based on the ground that the witness' answer concerned the actions of persons other than the defendant was sustained. Appellant's request for an instruction to the jury was granted. At this point, appellant made his motion for

mistrial. Apparently the motion was based upon the ground that the cumulative effect of all of the various parts of Marquez' testimony to which objection was taken were so prejudicial that only mistrial would be the proper remedy. The motion was denied. The next objection was overruled.

■ In regard to those instances in which appellant's objections were sustained and the request for an instruction was granted, and where no request for mistrial was made, there was no error. Appellant received all the relief which he requested. Moon v. State, 465 S.W.2d 172 (Tex.Crim. App.1971); Jenkins v. State, 435 S.W.2d 505 (Tex.Crim.App.1968).

■ Also, the refusal to grant appellant's motion for mistrial was not error. It has long been held by this Court that the error in asking improper questions or in admitting improper testimony may usually be cured by the withdrawal of the testimony and an instruction to the jury to disregard the same, except in extreme cases where the question or evidence is of such a damaging or prejudicial nature as to suggest the impossibility of withdrawing the impression produced in the minds of the jury. Casey v. State, 456 S.W.2d 945 (Tex. Crim.App.1970); White v. State, 444 S.W. 2d 921 (Tex.Crim.App.1969); Wheeler v. State, 413 S.W.2d 705 (Tex.Crim.App. 1967); Dove v. State, 402 S.W.2d 913 (Tex.Crim.App.1966); Gaines v. State, 400 S.W.2d 925 (Tex.Crim.App.1966); Harris v. State, 375 S.W.2d 310 (Tex.Crim.App. 1964); Miller v. State, 79 Tex.Cr.R. 9, 185 S.W. 29 (1916); Hatcher v. State, 43 Tex. Cr.R. 237, 65 S.W. 97 (1901); Miller v. State, 31 Tex.Cr.R. 609, 21 S.W. 925 (1893).

■ We feel that the testimony in this case was of such nature that the court's instruction to disregard it cured any error. The witness' answer was volunteered, and was not elicited by the prosecutor. Appellant contends that the holding in Music v. State, 135 Tex.Cr.R. 522, 121 S.W.2d 606 (1938) compels reversal.[1] We disagree. The first answers to which appellant objected were not followed by a motion for mistrial, so no error was reflected, at least in terms of each question standing alone. Likewise, the answer immediately preceding the motion for mistrial was not of such nature that it, standing alone, was not cured by the instruction. Unlike the answer in Music, supra, the answer preceding the motion here did not implicate the appellant. It concerned only his associate. Appellant contends however, that cumulative effect of all the answers was so prejudicial that a mistrial was warranted at the time he made his motion. We do not agree. In light of the later testimony of Marquez (corroborated by Officer Sides) that he purchased the heroin in question from appellant, which was admitted for the purpose of showing that appellant had it in his possession, we do not feel that the refusal to grant a mistrial was error. The instructions to disregard, in the face of this later testimony, would surely have been sufficient to cure any error.

In Music v. State, supra, the testimony to the effect that the defendant was a thief was, of course, the ultimate fact which the State sought to prove. In the case at bar, the ultimate issue to be proved was that appellant did possess heroin. The collateral fact that he sold heroin was extraneous. That he sold heroin to Marquez was admissible only to show that he

---

1. In Music, supra, a deputy sheriff testified voluntarily and not in response to a question, as follows: "I knew the house at No. 4323 Electra Street in Dallas. I knew Ray Music, Bill Garrett and H. B. Huddleston. I saw them going in and out of this house on the nights of March 20 and 22d. I have seen them around that house together *and a number of other thieves.*" (Emphasis supplied.) This Court held that the effect of this answer, which was to the effect that the defendant was a thief, was so prejudicial that its effect could not be cured by an instruction.

had possessed it. Thus, the collateral fact being admitted later would not render the first improper testimony unduly prejudicial. Not being the ultimate fact to be proved, the testimony was not as harmful as in Music v. State, supra.

Appellant asserts as his second ground of error that the trial court erred in not permitting a defense witness, Dr. Yero, who is a psychiatrist, to testify as to his opinion regarding the credibility of the State's principal witness, Marquez.

Dr. Yero testified on voir dire, out of the presence of the jury. Part of his testimony at that time was as follows:

"Q After having made psychiatric evaluation of Frank Marquez, Doctor, did you arrive at an opinion, based upon accepted psychiatric and medical practices, whether or not Frank Marquez is capable of relating—

"MR. GOTCHER: Objection.

"Q. —is capable of relating events in the past truthfully?

"THE WITNESS: Your Honor, shall I answer?

"THE COURT: Yes.

"A The answer to the question has to be qualified. I think he is capable of relating truthfully regarding his knowledge and recollection of events in the past, but if there is a particular gain, either material or psychological, or there is any particular psychological need for him to distort the truth, he is certainly very prone —would be very prone to do that.

\*   \*   \*   \*   \*   \*

"Q Now, if this were the fact, Doctor, would this psychological or material gain be sufficient benefit to Frank Marquez to prompt him to distort facts?

"A Yes."

The court ruled that Dr. Yero would be allowed to testify as follows:

"THE COURT: All right, Doctor, you will be limited to testify to what your diagnosis of the individual was, and no questions will be asked that relate in any way to his competency or his credibility, or his truth and veracity.

\*   \*   \*   \*   \*   \*

"MR. GARCIA: Thank you, Your Honor. One further question. I also offer the doctor's testimony regarding Frank Marquez' credibility in order—on the same basis that we were allowed to introduce convictions of crimes of moral turpitude, that this is a psychiatric evaluation of the same thing.

"THE COURT: He can give his psychiatric evaluation and his diagnosis. I don't want any opinions as to his competency and credibility, though, that is strictly an opinion."

In the presence of the jury, Dr. Yero testified that he had previously examined Marquez, and that his diagnosis was heroin addiction and severe character disorder. He also testified that a severe character disorder is defined as a defect in development of self-conflict, self-discipline and the lack of ability to postpone ratification of emotional needs. Dr. Yero also testified that Marquez had narcissistic tendencies, and had a limited concern for others. Dr. Yero also stated that he felt that Marquez' work as a police informer would satisfy more material than psychological gains. He also testified, "I think there are certain special considerations given these individuals when they become police informers." The court sustained the State's objection. Dr. Yero also stated that he felt that, in certain circumstances, if the material gain were sufficient, Marquez could be expected to disregard the rights of other persons. On cross-examination, Dr. Yero stated that Marquez had the capacity to recall, remember and retrieve from his memory.

At the outset, we must first determine whether Dr. Yero's opinion that Marquez' psychological condition might prompt him to distort facts was inadmissible as being an invasion of the province of the jury.

Many courts have excluded the opinion of an expert witness in regard to ultimate issues, or issues which are to be determined by the jury, on the ground that such opinion "invades the province" or "usurps the function of the jury."[2] We feel that where courts have excluded expert opinions on these grounds, they have fallen into error.[3] There are many instances in which expert witnessses are allowed to testify as to their opinion regarding the existence of facts which are necessary to the determination of the ultimate issue on trial. For example, if a medical witness testified, in a murder prosecution, that, in his opinion, the deceased died from "natural causes," is he not testifying as to the existence of an ultimate fact, the existence of which is to be finally determined by the jury? If the jury chooses to believe him, then the accused cannot be found guilty of murder. We perceive no reason why certain expert opinion evidence should be excluded merely because the opinion covers some ultimate fact issue.

The Supreme Court of Texas has repudiated the rule which prohibited the admission of expert opinion testimony in regard to ultimate issues. Carr v. Radkey, 393 S.W.2d 806 (Tex.1965). In that case, the Court held that an expert witness should have been allowed to testify that, in his opinion, a testatrix, at the time she wrote a will, "had sufficient ability to understand the business in which she was engaged, the effect of her acts in making the will, realized what she was doing, knew her people and her relatives, and knew the property she owned." The court held that this testimony should have been admitted, despite the fact that it concerned an ultimate issue which would have to be resolved by the jury. The court pointed out that the holding does not mean that an expert witness may state a legal conclusion, or that the witness in Carr v. Radkey, supra, would have been permitted to testify that the testatrix was "competent to make a will." The witness' concept of competency and the legal meaning of that term might be two entirely different matters. See Lindley v. Lindley, 384 S.W.2d 676 (Tex. 1964); Brown v. Mitchell, 88 Tex. 350, 31 S.W. 621 (1895). .

The repudiation of the "invasion of the province of the jury" rule does not mean that an expert or non-expert witness may freely state his opinion in regard to any fact in issue. Before his testimony can be admissible, the following criteria must be met: (1) He must be competent and qualified to testify. (2) The subject must be one upon which the aid of an expert opinion will be of assistance to the jury. (3) His testimony may not state a legal conclusion. For example, a lay witness, or non-expert witness usually will not be permitted to state an opinion, because he is in no better position to form an opinion, based on the facts which he possesses, than is the jury. Both are equally well qualified. His opinion testimony adds nothing to the case. It is entirely superfluous.[4]

2. For a survey as to the status of the rule in other jurisdictions, as of 1953, see Norvell, Invasion of the Province of the Jury, 31 Tex.L.Rev. 731 (1953).

3. The rule has been soundly, and in our opinion correctly, criticized by the commentators. See VII Wigmore on Evidence, § 1920, and McCormick and Ray, Texas Law of Evidence, § 1395 (2nd Ed.

1956); also see the late Professor Wigmore's comments on the use of opinion and expert testimony in general. VII Wigmore on Evidence, §§ 1917–1929.

4. According to both Wigmore and McCormick & Ray, this is the true reason for the exclusion of lay opinions. See VII Wigmore on Evidence, § 1918, 2 McCormick and Ray, Texas Law of Evi-

Also, even if the witness is an expert, he is not qualifed to give an opinion in regard to a matter outside his competency. For example, an examining physician may be quite well qualified to state that the cause of death was a gunshot wound. This does not mean, however, that he should be permitted to testify that, in his opinion, the defendant fired the shot. He is not competent to state such an opinion. The third requirement is best illustrated also by an example. Let us suppose that in the instant case the issue had been the competency of the witness to testify, instead of impeachment. If the doctor had been asked to give his opinion as to whether Marquez was a "competent witness," his answer would have clearly been inadmissible. He would have been stating a legal conclusion; something he would not be qualified to do. His conception of competency and the law's conception thereof may well be quite different. However, he could testify that the witness either possessed or lacked those traits which in a legal sense are required for competency.

In the past, this Court has frequently held that certain testimony was properly or improperly excluded, and stating as a reason that its admission either did or would have "invaded the province of the jury." However, upon a closer examination, it appears that the phrase "invasion of the province of the jury" has been used in many cases in which some other valid reason existed for the exclusion of the testimony. For example, this Court has often held that certain testimony was inadmissible because the jury was as well qualified to form an opinion, based on the facts in evidence, as was the witness, and that the witness' opinion constituted an invasion of the province of the jury. See e. g., Farmer v. State, 158 Tex.Cr.R. 397, 255 S.W.2d 864 (Tex.Crim.App.1953); Hill v. State, 134 Tex.Cr.R. 163, 114 S.W.2d 1180

(1938); McCullers v. State, 125 Tex.Cr. R. 357, 67 S.W.2d 879 (1933); Casey v. State, 116 Tex.Cr.R. 111, 32 S.W.2d 461 (1930); Maroney v. State, 115 Tex.Cr.R. 298, 29 S.W.2d 772 (1930); Davis v. State, 114 Tex.Cr.R. 72, 24 S.W.2d 417 (1930). On closer examination of the above cited cases, however, we find that in reality, the witness was either a lay witness who was attempting to state an opinion, or an expert witness who was stating an opinion outside the area of his expertise. That is, he was not competent to state the opinion. Likewise, we find some cases where the invasion of the province of the jury rule was stated, but the real reason for exclusion of the testimony was that the witness stated a legal conclusion. See Murrell v. State, 137 Tex.Cr.R. 92, 127 S.W.2d 896 (1939); Anderson v. State, 129 Tex.Cr.App. 586, 90 S.W.2d 564 (1936); Yowell v. State, 125 Tex.Cr.R. 594, 69 S.W.2d 413 (1934).

On the other hand, opinion testimony which concerns one of the ultimate issues in the case is often admitted without question. As stated earlier, when a physician states an opinion as to cause of death, he is stating an opinion in regard to what can be and is, in many cases, a crucial issue in the case. Or, when a ballistics expert testifies that, in his opinion, the bullet found in the body of the deceased was fired from a pistol (identified by other witnesses as belonging to the defendant), he is certainly stating an opinion in regard to a crucial issue. Such testimony however, is admissible. Or consider the case of the fingerprint expert who testifies that in his opinion the fingerprints of the defendant are the same as those exhibited in prison records. He is testifying as to a crucial fact and is stating an opinion. The use of such testimony has been sanctioned by this Court, e. g., Miller v. State, 472 S.W.2d 269 (Tex.Crim.App. 1971); Rinehart v. State, 463 S.W.2d 216

---

dence, § 1395 (2nd Ed. 1956). The exclusion of lay opinion has not escaped criticism either. See United States v.

Cotter, 60 F.2d 689, 693 (2nd Cir. 1932) opinion by L. Hand, J.

(Tex.Crim.App.1971); Johnson v. State, 435 S.W.2d 512 (Tex.Crim.App.1969); Vessels v. State, 432 S.W.2d 108 (Tex. Crim.App.1968). To hold that a fingerprint expert may testify only as to the "facts" (which are themselves, in reality, opinions), namely, that one set of fingerprints exhibits the same technical characteristics as another set, but that he may not state his opinion that the two sets were the same, or that they were made by the same person would indeed be an absurdity. Such a holding would mean that he could testify only that certain patterns in one set were identical with those in the other set, but could not opine that both sets were the same, or that the defendant's fingerprints were the same as those in the records. Yet if the "invasion of the province of the jury" rule is followed, such a result would clearly be required, for his opinion that the sets were the same would be an opinion regarding an ultimate issue.

■ It appears that this Court has not *really adhered too closely to the rule,* but rather, has cited it in many instances where other rules regarding opinion evidence would have excluded the testimony anyway. In fact, this Court has held in the case of Padillo v. State, 420 S.W.2d 712 (Tex.Crim.App.1967), that opinion testimony in regard to the ultimate fact issue is *required* to prove intoxication. Thus, we conclude that, for all practical purposes, the "invasion of the province of the jury" rule is and has been long dead. Recognizing this fact, we now follow the lead of the Supreme Court of Texas and *give it a long overdue and official burial.*[5]

Therefore, having determined that the testimony would not have been inadmissible for the reason of being an invasion of the province of the jury, we must now decide whether psychiatric evidence itself is admissible for impeachment purposes. We are aware that, in some jurisdictions, psychiatric evidence is not admissible, in most instances for impeachment purposes. See, for example, Ballard v. Superior Court of San Diego County, 64 Cal.2d 159, 49 Cal. Rptr. 302, 410 P.2d 838 (Cal.1966). However, other jurisdictions *do* permit such evidence to be introduced for impeachment. See e. g., United States v. Hiss, 88 F.Supp. 559 (S.D.N.Y.1950); State v. Butler, 27 N.J. 560, 143 A.2d 530 (1958); State v. Sinnot, 24 N.J. 408, 132 A.2d 298 (1957); State v. Klueber, 81 S.D. 223, 132 N.W.2d 847 (1965); Cf. Mosley v. Commonwealth, 420 S.W.2d 679 (Ky.1967).

■ After giving the matter careful consideration, we have decided to align our law with that of those jurisdictions which do not permit psychiatric testimony for impeachment. While we realize that the law cannot remain static in a world of ever-increasing knowledge, we do not feel that the benefits, if any, to be gained from the admission of such testimony are sufficient to offset the potential for abuse and other disadvantages which such a rule would undoubtedly generate.

Our principal fear in this regard is that the admission of psychiatric testimony will often cause the trial to become not only a trial of the defendant, but also a trial of the witness. If one side calls a psychiatrist for impeachment purposes, the other side will feel duty bound to do likewise (and rightly so). The result will likely be delay, confusion of the principal issues of the trial, and expense to the parties. However, these possibilities alone would not be sufficient to cause us to exclude such testimony. Our prime reason is that, in our opinion, the benefit to be gained from such testimony is not great enough to offset the disadvantages which we have listed.

5. We construe Articles 38.04 and 36.13, Vernon's Ann.C.C.P., which provide that the jury is the exclusive judge of the facts, as meaning that this Court, or the trial court may not reject certain testimony because of disbelief. For example, if the jury chooses to believe a witness in the face of a great deal of contradictory testimony, or in the face of expert opinion, the courts are bound by their decision.

The state of psychiatry is such that it is more an art than a science. There exists a great deal of divergence of opinion among eminently qualified and learned men of the profession. Also, being of the nature that it is, psychiatric opinion is not only often divergent, but is often inexact. In view of this nature, the benefit to be gained by the jury would quite probably be slight. Often the jury would be subjected to conflicting witnesses and inexact opinions, the value of which would be minimal in enabling the jury to decide the issue of credibility. As is so often the case in those instances where psychiatric testimony is now permitted, the jury will quite likely be witness to a "battle of experts" who are called, in reality, not for the general knowledge which they can bestow upon the court, but for the partisan benefit which the parties who called the witness hope to receive.

It is true that these same objections can be properly leveled at all expert testimony. However, we feel that psychiatric impeachment testimony differs, for the reasons stated, from other expert testimony. In short, we do not feel that such testimony will enable the jury to better decide the issue. The purpose of expert testimony is to supply knowledge which would not ordinarily be available to the trier of fact. While psychiatric information is not known by most laymen, there is still available to the jury the usual impeachment evidence such as criminal convictions and prior inconsistent statements to assist in the determination of credibility. Thus, unlike the case of highly technical issues, the jury, even without psychiatric testimony will not be left "in the dark." In fact, after being subjected to several conflicting, equivocating and highly technical psychiatric opinions, the jury may actually be more confused than before. We fail to perceive the benefit to be gained from "an amateur's voyage on the fog-enshrouded sea of psychiatry." [6] Therefore, the trial court did not err in limiting the testimony.

The judgment is affirmed.

## OPINION

MORRISON, Judge (concurring in part and dissenting in part).

I concur in the affirmance of this conviction and in that portion of the majority opinion which discusses the invasion of the province of the jury. See the opinion I prepared for the Court in Cordero v. State, 164 Tex.Cr.R. 160, 297 S.W.2d 174.

Further, I agree with the majority and do not conclude that in the case at bar the court erred in excluding witness Yero's testimony. I cannot, however, bring myself to agree with that portion of the majority opinion which pronounced an inflexible rule which does not permit any psychiatric testimony for impeachment purposes. I do not read the holding of the Supreme Court of California in Ballard v. Supreme Court of San Diego County, 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838, as does the majority. I quote from Ballard, supra:

"Thus, in rejecting the polar extremes of an absolute prohibition and an absolute requirement that the prosecutrix submit to a psychiatric examination, we have accepted a middle ground, placing the matter in the discretion of the trial judge."

I concur in the affirmance of this conviction but not upon the reasoning set forth in the majority opinion as I read it.

6. United States v. Flores-Rodriguez, 237 F.2d 405, 412 (2nd Cir. 1956) (concurring opinion).